Filed 10/6/20  L.C. v. Superior Court CA4/1
Opinion following transfer from Supreme Court

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| L.C., | D076780 |
| Petitioner, | |
| v. | |
| THE SUPERIOR COURT OF SAN DIEGO COUNTY, | (San Diego County Super. Ct. Nos. SCD283672, JCM241992) |
| Respondent; | |
| THE PEOPLE, | |
| Real Party in Interest. | |

ORIGINAL PROCEEDINGS in mandate.  Sharon B. Majors-Lewis, Judge.  Petition granted.

George L. Schraer on behalf of Petitioner.

Zaki Zehawi for San Diego Criminal Defense Lawyer's Club and San Diego Criminal Defense Bar Association, as Amicus Curiae on behalf of Petitioner.

Summer Stephan, District Attorney, Mark A. Amador, Chief Deputy District Attorney, Linh Lam, Assistant Chief Deputy District Attorney and

Jennifer Rebecca Kaplan, Deputy District Attorney, on behalf of Real Party in Interest.

In January 2019, the People filed in the juvenile court of respondent San Diego County Superior Court a petition under Welfare and Institutions Code[1] section 602 to declare L.C. a ward of the court, alleging she committed torture (Pen. Code, § 206), aggravated mayhem (Pen. Code, § 205) and attempted murder (Pen. Code, §§ 187, subd. (a), 664) of her younger brother D.C., and in committing the latter offense used a deadly weapon (Pen. Code, § 1192.7, subd. (c)(23)) and inflicted great bodily injury (Pen. Code, § 12022.7, subd. (a)). The People further alleged under section 707 that L.C. was not fit to be dealt with under the juvenile court law. Following a lengthy transfer hearing, the juvenile court, addressing the factors set forth in section 707, subdivision (a)(3),[2] determined that L.C. was not suitable for treatment in the juvenile system and transferred her case to a court of criminal jurisdiction (adult court). L.C. filed a petition for writ of mandate challenging the decision and sought an emergency stay; this court summarily denied the petition and request.

---

[1]    Undesignated statutory references are to the Welfare and Institutions Code.

[2]    Section 707, subdivision (a)(3) requires the juvenile court to consider "[t]he degree of criminal sophistication exhibited by the minor" (§ 707, subd. (a)(3)(A)(i)); "[w]hether the minor can be rehabilitated prior to the expiration of the juvenile court's jurisdiction" (§ 707, subd. (a)(3)(B)(i)); "[t]he minor's previous delinquent history" (§ 707, subd. (a)(3)(C)(i)); "[s]uccess of previous attempts by the juvenile court to rehabilitate the minor" (§ 707, subd. (a)(3)(D)(i)); and "[t]he circumstances and gravity of the offense alleged in the petition to have been committed by the minor" (§ 707, subd. (a)(3)(E)(i)). Section 707 discusses other relevant subfactors that the court may evaluate, as further discussed in part II, *post*. (See, e.g., § 707, subd. (a)(3)(A)(ii).)

The California Supreme Court granted L.C.'s ensuing petition for review. It transferred the matter to this court with directions to vacate our order and issue a new order directing respondent to show cause why the relief sought in the petition should not be granted on the ground (1) the juvenile court abused its discretion by relying on speculation in considering L.C.'s family circumstances, considering those circumstances in a manner not contemplated by section 707, and failing to consider whether rehabilitative efforts might be available in a setting other than the family home; or (2) the court abused its discretion by relying on a finding that L.C.'s potential involuntariness defense was not credible; or (3) the record does not reflect that the juvenile court in considering the totality of the evidence adequately evaluated testimony of two experts and a deputy probation officer. The latter witnesses all found based on the section 707 criteria that L.C. was a proper subject for treatment in the juvenile justice system.

We complied with the Supreme Court's order and directed respondent to file a return. Having considered L.C.'s petition, the return, the reply, and an amicus brief filed by the San Diego Criminal Defense Lawyer's Club and Bar Association,[3] we now conclude the juvenile court abused its discretion in certain respects, relying on speculation and irrelevant matters in its analysis. Because the court's analysis was deficient and in our view its remarks concerning L.C.'s parents and their behavior would cause parties to reasonably entertain a doubt about the court's impartiality, we grant the petition and order a new transfer hearing as set forth below.

---

[3] Though we have considered the amicus brief, we found it unhelpful as largely duplicative of L.C.'s writ petition.

FACTUAL AND PROCEDURAL BACKGROUND

*The Offense*

In the early morning hours of January 10, 2019, then 17-year-old L.C. used a large knife to inflict 56 stab wounds on her younger brother D.C., who had been sleeping in his bed. L.C.'s brother suffered lacerations to his face, chest, neck and shoulder that penetrated the joint, as well as injuries to his lungs and other organs. After the stabbing, L.C. entered her parents' bedroom and told them that she thought she had hurt D.C. She was wearing only her underwear without a top, which according to her father was unusual for her outside of her closed bedroom.

Responding police reported that L.C.'s father surmised L.C. was sleepwalking, though he admitted she never had before. L.C.'s father told police he did not know why L.C. would harm her brother, relating that she did well in school, had been applying to colleges, and on a recent outing to a performance sat happily with her friends. In an interview after her arrest, L.C. initially told San Diego Police Detective Joseph Volker she did not remember waking up, getting a knife, or stabbing her brother, but on further questioning she made incriminating statements to the detective, telling him how she got the knife from the kitchen and the reasons why she stabbed her brother.

*The Petition to Transfer to Adult/Criminal Court*

In addition to filing the above-mentioned section 602 petition, the People moved to transfer L.C. to adult court. In their supporting brief, the People acknowledged that Proposition 57[4] requires juvenile courts to

---

[4] Approved in November 2016, Proposition 57 rolled back prior law allowing district attorneys to file charges against juvenile offenders directly in adult court. It "largely returned California to the historical rule" by eliminating direct filing in criminal court by prosecutors. (*People v. Superior*

consider five factors when deciding whether a minor is suitable for treatment in juvenile court, but asserted that only one factor need support the determination. They contended that L.C. was unfit to be dealt with in the juvenile system based on the degree of criminal sophistication she exhibited in planning and committing the crimes and their gravity. In part, the People argued that "running her finger along the [knife] blade to ensure it was sharp demonstrates [L.C.] was goal oriented and had a calculated plan."

*L.C.'s Opposition to Transfer*

In opposition, L.C. pointed out that Proposition 57 eliminated the presumption of unfitness for treatment under the juvenile court law and that the court was required to evaluate the totality of circumstances, taking into account the factors set forth in section 707. She argued the court should determine she was fit to remain in juvenile court based on the fact all experts agreed she was unlikely to reoffend and could be rehabilitated through the juvenile court system. L.C. submitted reports prepared by (1) San Diego

---

Court (*Lara*) (2018) 4 Cal.5th 299, 305; see also *People v. Superior Court* (*Alexander C.*) (2019) 34 Cal.App.5th 994, 998; *People v. Superior Court* (*K.L.*) (2019) 36 Cal.App.5th 529, 536-538.) Under Proposition 57, " '[c]ertain categories of minors . . . can still be tried in criminal court, but only after a juvenile court judge conducts a transfer hearing to consider various factors such as the minor's maturity, degree of criminal sophistication, prior delinquent history, and whether the minor can be rehabilitated.' " (*Lara*, at pp. 305-306; *Alexander C.*, at p. 998.) There is no longer a presumption that a minor who committed certain serious offenses is unfit for juvenile court. (*D.W. v. Superior Court* (2019) 43 Cal.App.5th 109, 116; *C.S. v. Superior Court* (2018) 29 Cal.App.5th 1009, 1015.) The stated intent of Proposition 57 is that a judge, not a prosecutor, decide whether juveniles should be tried in adult court. (*K.L.*, at p. 539.) But "[t]aken as a whole, it appears the intent of Proposition 57 was to reduce the number of youths who would be prosecuted as adults. This appears to be an intent that will further other broader purposes of Proposition 57 to reduce the number of offenders incarcerated in state prisons, and to increase the opportunities for rehabilitation, particularly for juvenile offenders." (*Id.* at p. 541.)

County Juvenile Probation Officer Robert Pinedo; (2) clinical and forensic psychologist Clark Clipson, Ph.D.; (3) forensic psychiatrist Jeffery Rowe, M.D.; (4) neuropsychologist Mark McDonough, Ph.D.; (5) neurologist J. Steven Poceta, M.D. and psychologist Derek Loewy, Ph.D., who specialize in sleep disorders; (6) psychologist Iris Blandón-Gitlin, Ph.D., on the reliability of information obtained from subjects of interrogation; and (7) optometrist Carl G. Hillier, O.D., who diagnosed L.C. with visual disturbances. L.C. also submitted teacher letters regarding her excellent academic achievements and good character, copies of transcripts showing she was a straight-A student, and pictures of various awards she had received.

Probation officer Pinedo recommended that the court deny the People's motion and order L.C. remain under juvenile court jurisdiction; he concluded that L.C. was "amenable to the care, treatment, and training available through Juvenile Court." Pinedo assessed L.C.'s criminal sophistication both in terms of her engaging in a criminal lifestyle and also in conducting the present offense. He reported that L.C. had a "pro-social" lifestyle, attending school, doing well academically, participating in pro-social activities, and refraining from alcohol and drug use. He noted no one had reported any family relationship issues. As for the present offense, Pinedo found no indication L.C.'s offenses were preplanned; he observed she did not attempt to conceal the weapon, deflect culpability to someone else, destroy evidence or flee the scene to evade capture. He noted reports that she was visibly upset when she entered her parents' bedroom and told them she had hurt D.C. Pinedo also opined given L.C.'s age (18 years, one month) and what would be the remaining approximately seven-year period if she were committed to the Division of Juvenile Justice, L.C. could be rehabilitated within the juvenile court's jurisdiction, as "[o]verall" she was compliant during her juvenile hall

6

custodial period and home detention, she lacked a delinquent history, and her active participation in programming while in juvenile hall demonstrated a potential and desire to grow and mature. Though the manner of the offense in his view was egregious and warranted L.C. being transferred to the adult criminal division, he nevertheless concluded given her behavior patterns and social history, and all of the section 707 criteria, that she should be retained under juvenile court jurisdiction.

Dr. Rowe found in his report that L.C. "[did] not exhibit criminal sophistication to any degree." He addressed the "impact of [L.C.'s] family and community environment and any childhood trauma that [she] may have experienced on [her] criminal sophistication," stating: "[L.C.] lives in a safe, quiet community. Her family is not involved in criminal activity and she has not been exposed to criminal or dangerous behavior in the past." Dr. Rowe observed L.C. had no history of delinquency, impetuosity or risk-taking behavior, but had been described as inhibited, self-contained, and rule-bound. He noted L.C.'s behavior and the harm were very serious and she had total involvement in the crime, but reported it was difficult to understand how her mental and emotional development contributed to the crime. According to Dr. Rowe, L.C. could undergo further evaluation and treatment to better describe and understand the difficulties that led to her violent behavior, and once clarified, they could be addressed through services ordered by the juvenile court. Though he posited L.C. could have a mental disorder "related to intense internal feelings that are hidden and build inside only to be later released in an intense burst," he stated that was difficult to determine with the available information, and thus he could not diagnose to a reasonable degree of medical certainty a clear mental health or developmental disorder.

Ultimately, Dr. Rowe opined that L.C. was fit and proper to be dealt with in the juvenile justice system.

Dr. McDonough conducted a neuropsychological evaluation of L.C. In his report, he described her psychological profile as having "submissive and somewhat conventional personality traits" with "no indications of impulsivity, aggression, difficulties with thought processes, reality testing, or mood-based concerns." He found no "red flags" in her medical and academic history aside from a chronic sleep disturbance "more prominent in the three months prior to the incident . . . ." Dr. McDonough observed that L.C.'s early psychiatric history was limited, but that in 2016 she had expressed some suicidal ideation in connection with some respiratory issues that affected her trombone playing, making a very small cut on her wrist and realizing that hurt, then taking an overdose of an antihistamine and allergy medication. L.C. however denied current suicidal thoughts. Dr. McDonough stated L.C.'s plan if she were released from juvenile hall was to stay with her uncle with precautions of locks and cameras; he concluded the plan was "quite adequate and appropriate" as "[f]ormal assessment does not document [L.C.] as a risk for harm to self or other[s]."

*The Fitness Hearing*

The court conducted a two-day fitness hearing. The People presented testimony from L.C.'s brother concerning the stabbing and his treatment; law enforcement investigators Carly Paris, Paul David Brinkerhoff, and Peter Martinez; Detective Volker; D.C.'s treating surgeon; a roommate of L.C.'s from a five-week summer program; and sleep medicine specialist Anoop Karippot, M.D.

Detective Volker recounted his actions on the morning of the incident, including his interview of L.C.'s father, who he described as "emotionally

8

withdrawn." He testified that while D.C. was en route to the hospital, he asked L.C. what she used to hurt D.C., and she told the detective she did not remember. According to Detective Volker, L.C.'s father was recorded talking to a friend and telling him or her that L.C. was sleepwalking and had accidentally hurt D.C. The detective testified that he conducted L.C.'s interview in keeping with his training, and there was nothing different or unusual about it. On cross-examination, Detective Volker admitted he did not know who L.C.'s father was talking to; he did not ask about the father's lack of emotion and had "no idea" of the reason for it.

Dr. Karippot explained that parasomnia or sleepwalking was usually a childhood disorder from ages 8 to 13 or 14. He had reviewed the reports of Drs. Poceta and Loewy, as well as police reports and hospitalization records, and testified he had doubts about the conclusion that L.C. had a parasomnia or sleepwalking event on the morning in question given her cognitive interactions and recollection of the events.

Peter Martinez, a criminal investigator, testified he assisted in reviewing L.C.'s laptop computer, and testified about a September 2016 note from L.C. containing the only mention of D.C. in which L.C. said in part, "[D]on't give my Roblox account to [D.C.]." Martinez found no entry or bookmark about sleepwalking. He testified that the computer forensics report identified 17 files with videos on how to sharpen knives, as well as two pictures, one apparently a cartoon, depicting women holding knives.

L.C. presented testimony from Drs. Clipson, Poceta and Blandón-Gitlin; L.C.'s father; and mental health clinician Kaisa Seibert. L.C.'s father testified about the events following the stabbing and his reaction to it, explaining he supposed he was "in . . . a bit of a state of shock" but tried to "keep it together emotionally" as a father and keep a "level head" to handle

9

what he thought were important things. Dr. Clipson had conducted a clinical interview as well as a mental status examination of L.C., who he described in his report as a "very promising young woman with a potentially bright academic and occupational future." Dr. Clipson found L.C. did not demonstrate evidence of criminal sophistication and was capable of being rehabilitated before expiration of the juvenile court's jurisdiction.[5] In his report, Dr. Clipson observed that though the charges were very serious, there were questions about L.C.'s state of consciousness at the time, and even if that were not the case, assessment and treatment of any disorder would be best through the more flexible and rehabilitation-focused juvenile court system rather than the adult system. He concluded based on the section 707 criteria, L.C. was a fit and proper subject to be dealt with in juvenile court. At the hearing, Dr. Clipson testified that L.C. was a very rare "adaptive-type" juvenile offender, a type that had the highest probability of success in the juvenile court system. Considering that, as well as L.C.'s academic and social history, Dr. Clipson stated there was every reason to believe L.C. would apply herself just as diligently to any treatment programs offered to or required of her.

Dr. Poceta, a board certified neurologist and sleep medicine doctor with the Scripps Clinic sleep disorder center, and Dr. Loewy, a psychologist, spoke with L.C.'s parents, interviewed and examined L.C., and had her undergo a

---

[5] In part, Dr. Clipson reported that L.C. "has no prior history of delinquent or criminal behavior. She does not demonstrate evidence of a conduct disorder and has not demonstrated a pattern of behavior showing a commitment to a criminally oriented way of life. She does not demonstrate antisocial, narcissistic, or psychopathic personality traits. She does not socialize with delinquent peers and has adequate family support. Indeed there is much evidence that the minor is highly responsible and conforming to social norms."

10

sleep study. He and Dr. Loewy prepared a report concluding that L.C.'s actions during the incident were consistent with a parasomnia, specifically a confusional arousal followed by an episode of sleep walking, and that L.C. was unconscious during that time. They described the circumstances supporting their conclusion: L.C. was sleep deprived, she had a delayed body clock, she had set her phone alarm to go off soon after she fell asleep, she was improperly dressed during the event (clothed only in underwear), she experienced amnesia with a dream-like memory of cutting her leg, she was confused and distressed after the event, and the attack was somewhat ineffective and clumsy, during which she cut her dominant wrist. Dr. Poceta testified that on the morning in question, L.C. had an episode of somnambulistic, sleepwalking-related violence, during which she did not do anything intentionally or maliciously and was not necessarily aware of her actions. He related that they had recommended steps to ensure L.C. could be safely released, and Dr. Loewy was continuing to see L.C. and monitoring her compliance with those conditions. Dr. Poceta admitted on cross-examination that confusional arousal was most common in children ages 5 to 12. He agreed L.C. did not have any history of sleepwalking, and testified that for the type of sleepwalking where a person runs or falls, that person would not be able to have a conversation. Dr. Poceta agreed it was uncommon for a sleepwalker to commit violence on someone without provocation. On redirect, Dr. Poceta testified that the absence of prior sleepwalking in L.C.'s history did not rule out or alter his opinion.

Dr. Blandón-Gitlin, who had reviewed various videos including from L.C.'s interview and interrogation as well as police reports but had not interviewed L.C., testified about L.C.'s session with Detective Volker. She believed some of L.C.'s statements were unreliable, observing that during

11

L.C.'s interview Detective Volker had suggested scenarios of what he believed happened, pressuring L.C. to effectively adopt the idea that she woke up in the middle of the night, got the knife and stabbed her brother. Dr. Blandón-Gitlin stated this was also the case when Detective Volker suggested that the reason for the incident was that L.C.'s brother got more attention and L.C. felt rejected. The doctor addressed L.C.'s question to Detective Volker at the interview's conclusion about whether she was lying and stated that question was consistent with a person led to adopt a particular belief. Dr. Blandón-Gitlin testified that L.C. believed Detective Volker was a human lie detector, and wanted to understand whether what she recounted was what happened, because she initially stated she had no memory of it. On cross-examination, Dr. Blandón-Gitlin admitted that L.C. spoke about putting a pillow over D.C.'s face without any suggestion or mention of a pillow by Detective Volker.

*Juvenile Court's Ruling*

The following day, the juvenile court heard arguments from counsel and announced its decision to grant the motion to transfer the case to criminal court. At the outset of its ruling, the court thanked counsel and stated: "I don't really know how to express my concerns about this particular case *because there was a lot of evidence that I wished I had that I didn't have.* But let me say this, that I'm going to start first of all with some of the points that I think are critical in my decision . . . ." (Italics added.) The court advised counsel it thought L.C. should be sent to adult court. It continued: "*This has nothing to do with the evidence.* The first time I've seen any emotion from the parents in this case is right now from Mr. [C]. He has his face in his hands. I never saw him look sad, teary, when the son was testifying. I never saw the mother do that either. I can tell you that they have provided this young lady the most amazing, spectacular, road to success

12

that you could ever imagine. *And I have no evidence of this* but something is wrong. Something is definitely distinctly wrong with the dynamics in this family. I don't know what it is. I can't put my finger on it but something is wrong and I'll address that more later." (Italics added.)

The court went on to describe the way in which it perceived L.C.'s parents were not focused on the fact D.C. was stabbed 56 times, but on L.C.'s schooling or music lessons. The court noted L.C.'s parents' success and L.C.'s extraordinary intelligence and questioned why the parents had not "pick[ed] up that she hates her brother and hated her sister" but rather were "more concerned about school and her path to success . . . ." The court stated: "So it's—here's my issue with that, if they don't see all that and their solution to keeping the community safe, her sibling safe, themselves safe, is to put multiple alarms and locks on doors so that everybody will know if she leaves her bedroom so they can go what? Hide? Get armor to keep themselves from being stabbed in the middle of the night? *That's the wrong approach to me. It doesn't sound like the proper way to rehabilitate someone.*" (Italics added.)

As to criminal sophistication, the court conceded that L.C. was not the sort of juvenile with a lengthy juvenile history or familiarity with guns and crimes, but it observed L.C. was exceptionally intelligent, able to prepare reports and do computer research or searches on how to sharpen knives, she was familiar with small razor-type knives in her crafts, and she had made tentative cuts on herself at one point in her life in a suicide attempt but did not go through with it "because it probably hurt." The court considered this to be evidence that L.C. knew a knife would hurt and that it would take drastic efforts to kill another by use of a knife. It also observed L.C. had an "extraordinary interest in stabbing and bladed weapons" given the presence of foam replicas in her room and the videos found on her computer.

The court "d[id]n't buy for one minute that [L.C.] was sleepwalking at all." The court pointed to the expert testimony that a person sleepwalking is "in a fugue state" and doesn't know what they are doing or remember they were sleepwalking. It found there was "usually" a history of sleepwalking and such events were over by the time someone reached L.C.'s age. The court instead found that L.C. "wasn't sleepwalking" but "knew exactly what she was doing" and "thought about the method" she wanted to use to kill D.C. Relying on L.C.'s statements to Detective Volker, the court stated: "[L.C.] indicated she went downstairs to get water and a knife. She selected a chef knife that was at least 12 inches long, and she picked one that was huge and very sharp. And she said, 'I want to test it to see if it was sharp.' She said, 'I didn't want to do them in the stomach. I didn't want the stomach. I didn't want to stab him. I wanted it to be quick. I wanted it just to be in his throat.' "[6]

The court also discussed what it considered to be conflicting evidence about L.C.'s sleeping attire and how "unsettling and disconcerting" it was that she would enter her parents' bedroom partially unclothed. It remarked

---

[6] The court reiterated these remarks again later in its ruling, stating: "[L.C.] didn't want to stab him in the stomach. She wanted it to be quick. *And so I don't know if there were any Google searches that say 'what*'s *the quick way to kill someone?'* But she watches all these—like I say, these stabbing things. These whatever. These fantasy things. *I don't know if any of those have people cutting—whatever that game she plays with herself. I don't know what those are like, but I know there's a lot of violent video games out there and kids know about them.* But she clearly cut his throat, and he said there was a wound near the carotid artery. A bright girl would know that a carotid artery would bleed like a pig. Also, she may even know that if she cuts his throat, it might cut his vocal cords and he can't scream. *I'm just telling you that there's some sophistication here in the way this was all done.* All we know is that she was not bloody, apparently, when the police came." (Italics added.)

that was not "something you normally hear" and it "d[id]n't believe it." The court stated its belief L.C.'s parents would be unable to rehabilitate L.C. because they had covered up for her or "enabled" her after the crime: "I don't have any evidence about what happened to [L.C.'s] clothes if she was wearing them. I don't know if they were bloody. . . . With that amount of blood, there's got to be a top for her, some bottoms, bloody as all get-out. Or her own body should be bloody because the wall was bloody with cast-off. . . . [¶] So there's been a shower. There's been some cleaning up. There's been something. *Which is why I don't think [L.C.'s] going to able to be rehabilitated because you, if you cover up and enable your child in a situation like this where they darn near lost their [other] child, that is not a place where [L.C.'s] going to be rehabilitated. There's something wrong with her and her upbringing, and I don't know what it is.* I don't know if it's the drive to make her succeed. I don't know if there's something off with her relationship with her father that she's so jealous that her place is going to be taken from her. I don't know. I don't want to speculate about that but there's something wrong here." (Italics added.)

The court found that "the degree of criminal sophistication in this case is off the charts" based "on the way [the offense] was done." As for whether L.C. could be rehabilitated before expiration of juvenile court jurisdiction, the court observed L.C. would be there seven years until she was 25, but it found she could not be rehabilitated within that time: "[L.C.] can never be rehabilitated, in the Court's opinion, until we get to the root—the root of why is this happening. Why did all of this happen? What is it with her family, with her relationship? . . . Why is she jealous in that way? And why would a girl that's so successful have a room that looks like utter chaos? On the outside everything looks good. On the inside there's something wrong. . . .

15

[T]here's something off with no discipline there.  And here are the parents, instead of wondering why she did this, they're all thinking about, 'Can she take her trombone?'  When she was in [Detective Volker's] interview, she wanted to know after she explained all of these horrible things she did to her brother, how she hates him, she hates her sister, she wants to know, 'Can I go to school now?'  Or 'When can I go back?'  Absolutely clueless on the—or care or—not caring about the gravity of what she has done based on jealousy or maybe based on something that she can't talk about is happening to her in her family.  Whether it's verbal abuse.  Whether it's pressuring her to be the best when no person's perfect.  There's something that happened to her that made her shift off of the right path.  And parents that aren't making her accountable, they'll never be able to rehabilitate her if they don't admit that there's something awfully wrong when she tried to kill her own brother . . . ."  The court described L.C. as "cold-blooded" about her actions and lacking any "real guilt" about the gravity of what she had done.  It continued:  "And there's something unhealthy about [L.C.'s] feelings towards her father.  I don't know what it is, but the fact that she's so jealous that [D.C.'s] going to grow up and do boy things with her father, it made me have an unsettled feeling about it."

The juvenile court found L.C. had no prior history of delinquency.  As to previous attempts at rehabilitation, it observed L.C.'s parents had "bent [over] backwards to make her time between the offense and now the best for [L.C.]" by "giv[ing] her trombones" and being concerned about applying to schools, even deferring her admission to college "as if this is a minor thing that happened."  The court remarked that it saw L.C. as "someone who can— if she admits and deals with whatever the cause and factors are for her behavior—if she can deal with that and it may take years to unravel and drill

16

down and figure out what made her do this. And I don't think it's going to happen in eight years because it took her 17 years to get to that point over stated things that are truly minor in nature. They just don't match why [L.C.] would do it, and they need to take a hard look at themselves and figure it out and really be honest about it to save this daughter."

As to the last criterion regarding the circumstances and gravity of the offense, the court found the crimes were "horrific." Based on its evaluation of all the section 707 criteria, the court stated L.C. should be transferred to criminal court for trial. It stated: "I also want everybody to understand that the one thing that I gave the greatest weight to was the actual gravity of the offense, and the planning I think that occurred in this. And [L.C.'s] attempt to deflect by claiming that she was sleepwalking."

DISCUSSION

I. *Standard of Review*

We review for abuse of discretion a juvenile court's finding a minor is unsuitable for treatment in the juvenile court. (*People v. Superior Court* (*Jones*) (1998) 18 Cal.4th 667, 680 (*Jones*); *J.N. v. Superior Court* (2018) 23 Cal.App.5th 706, 714.) " 'There must be substantial evidence adduced at the hearing that the minor is not a fit and proper subject for treatment as a juvenile before the court may certify him to the superior court for prosecution.' " (*J.N.*, at p. 714.) Substantial evidence is evidence that is reasonable in nature, credible, and of solid value. (*Jones*, at p. 681 & fn. 3.) "In reviewing the juvenile court's decision, '[t]he . . . court's findings of fact are reviewed for substantial evidence, its conclusions of law are reviewed de novo, and its application of the law to the facts is reversible only if arbitrary and capricious.' [Citation.] 'All exercises of discretion must be guided by applicable legal principles . . . . [Citations.] If the court's decision is

17

influenced by an erroneous understanding of applicable law or reflects an unawareness of the full scope of its discretion, the court has not properly exercised its discretion under the law.  [Citation.]  Therefore, a discretionary order based on an application of improper criteria or incorrect legal assumptions is not an exercise of informed discretion and is subject to reversal.  [Citation.]'  [Citation.]  The 'discretion must be exercised in accordance and within the framework prescribed by the Legislature.' "  (*J.N.,* at pp. 714-715; see also *Jones*, at pp. 681-682.)

## II.  *Section 707 and the Transfer Criteria*

"When a minor has been charged in the juvenile court with any felony allegedly committed when he or she was 16 years of age or older, the prosecutor 'may make a motion to transfer the minor from juvenile court to a court of criminal jurisdiction' " pursuant to section 707, subdivision (a)(1).  (*J.N. v. Superior Court*, *supra*, 23 Cal.App.5th at p. 711; see also *D.W. v. Superior Court*, *supra*, 43 Cal.App.5th at p. 116.)  That section, and California Rules of Court, rule 5.770 (rule references are to the California Rules of Court), set forth the procedures and standards under which a minor may be transferred to adult/criminal court.  (§ 707, subd. (a)(1).)  The prosecution bears the burden of proving by a preponderance of the evidence that there should be a transfer to criminal court jurisdiction.  (Rule 5.770(a); see also *J.N.*, at p. 715.)

In deciding whether a minor should be transferred to criminal court, the juvenile court "shall consider" (§ 707, subd. (a)(3)) five criteria, which have remained unchanged since 1975.  (*D.W. v. Superior Court*, *supra*, 43 Cal.App.5th at p. 116.)  The first is the degree of criminal sophistication exhibited by the minor.  (§ 707, subd. (a)(3)(A)(i).)  Section 707 provides that when evaluating criminal sophistication, "the juvenile court may give weight

18

to any relevant factor, including, but not limited to, the minor's age, maturity, intellectual capacity, and physical, mental, and emotional health at the time of the alleged offense, the minor's impetuosity or failure to appreciate risks and consequences of criminal behavior, the effect of familial, adult, or peer pressure on the minor's actions, and the effect of the minor's family and community environment and childhood trauma on the minor's criminal sophistication." (Section 707, subd. (a)(3)(A)(ii).)

The second criterion is whether the minor can be rehabilitated prior to the expiration of the juvenile court's jurisdiction. (§ 707, subd. (a)(3)(B)(i).) When evaluating that criterion "the juvenile court may give weight to any relevant factor, including, but not limited to, the minor's potential to grow and mature." (§ 707, subd. (a)(3)(B)(ii).)

The third criterion is the minor's previous delinquent history. (§ 707, subd. (a)(3)(C)(i).) The law specifies that when evaluating that history "the juvenile court may give weight to any relevant factor, including, but not limited to, the seriousness of the minor's previous delinquent history and the effect of the minor's family and community environment and childhood trauma on the minor's previous delinquent behavior." (§ 707, subd. (a)(3)(C)(ii).)

The fourth criterion is the success of previous juvenile court attempts to rehabilitate the minor. (§ 707, subd. (a)(3)(D)(i).) When evaluating those prior attempts, "the juvenile court may give weight to any relevant factor, including, but not limited to, the adequacy of the services previously provided to address the minor's needs." (§ 707(a)(3)(D)(ii).)

The fifth criterion is the circumstances and gravity of the offense alleged to have been committed by the minor. (§ 707(a)(3)(E)(i).) When evaluating the circumstances and gravity of the offense, "the juvenile court

19

may give weight to any relevant factor, including but not limited to, the actual behavior of the person, the mental state of the person, the person's degree of involvement in the crime, the level of harm actually caused by the person, and the person's mental and emotional development." (§ 707(a)(3)(E)(ii).) A juvenile court is required to "clearly and explicitly 'articulate its evaluative process' by detailing 'how it weighed the evidence' and by 'identify[ing] the specific facts which persuaded the court' to reach its decision to transfer [a minor] to adult court." (*C.S. v. Superior Court*, *supra*, 29 Cal.App.5th at p. 1035.)

"A minor . . . is not required to establish innocence in order to show amenability to the juvenile court system. 'Whether the youth committed the act alleged in the petition is not the issue in [a fitness hearing]; the sole question is whether he [or she] would be amenable to treatment in the event that he is ultimately adjudged a ward of the court.' [Citations.] Indeed, the criteria used to determine fitness are based on the premise that the minor did, in fact, commit the offense. [Citation.] Instead, the minor may use the information contained in police reports, the probation report, expert evaluations, and other submissions to the court 'to argue that his participation was not as grave or serious as the charge would initially lead a court to conclude.' " (*Jones*, *supra*, 18 Cal.4th at p. 682, in part quoting *People v. Chi Ko Wong* (1976) 18 Cal.3d 698, 716, overruled on other grounds by *People v. Green* (1980) 27 Cal.3d 1, 33-34.) Additionally, the fact that the minor committed the offense does not automatically require a finding of unfitness. (*Jones*, at p. 682.)

In holding a fitness hearing does not involve an adjudication of guilt, *Jones* relied in part on *People v. Superior Court* (*Rodrigo O.*) (1994) 22 Cal.App.4th 1297, 1303-1304 (*Rodrigo O.*), in which a panel of this court

issued a writ directing the trial court to vacate its fitness order because the court had erroneously based findings on irrelevant evidence. (*Id.* at p. 1299.) The juvenile court there had found a minor was fit for juvenile court treatment after considering the minor's affirmative defense of alibi on the question of the degree of criminal sophistication and the gravity of the offense. (*Id.* at pp. 1301-1302, 1304.) This court explained that because the issue in a transfer hearing is not whether the youth committed the offense, the alibi defense was not relevant. (*Id.* at p. 1303.) In sum, the minor's "evidence that he was elsewhere at the time of the crimes was not relevant to the court's determination of his fitness to be a subject of juvenile court treatment." (*Rodrigo O.,* at p. 1304.)

Thus, though juvenile courts have broad discretion in assessing the circumstances for purposes of a transfer hearing (*Rodrigo O.*, *supra*, 22 Cal.App.4th at p. 1303 [juvenile court may consider any relevant evidence the People or minor wish to submit, including extenuating or mitigating circumstances], that discretion is not "unbridled" (see *People v. Chi Ko Wong*, at p., 719), and the evidence is nevertheless "limited by the basic tests of relevancy and materiality to the issue presented." (*Rodrigo O.,* at p. 1303; *Chi Ko Wong*, at p. 719.) Additionally, "fundamental fairness demands that [presentence probation] reports be founded on accurate and reliable information." (*Chi Ko Wong*, at p. 719.)

### III. *Analysis*

With these principles in mind, we turn to whether the juvenile court properly exercised its discretion in considering and assessing the section 707 fitness criteria. As we explain, we conclude the court abused its discretion in certain respects, relying on speculation and irrelevant matters in its analysis. Further, in our view the court's remarks, particularly about L.C.'s parents

21

and their behavior, would cause parties to reasonably entertain a doubt about the court's impartiality, thus we grant the petition and remand for L.C. to receive a new transfer hearing before a different judicial officer in the interests of justice. (Code Civ. Proc., § 170.1, subd. (c) ["[O]n its own motion an appellate court shall consider whether in the interests of justice it should direct that further proceedings be heard before a trial judge other than the judge whose judgment or order was reviewed by the appellate court"]; see *Peracchi v. Superior Court* (2003) 30 Cal.4th 1245, 1256-1257 [remand to different judge may be necessary where the ruling or sentence of the original judge indicates an animus inconsistent with judicial objectivity or whimsical disregard of the law], quoting *People v. Gulbrandsen* (1989) 209 Cal.App.3d 1547, 1562; Pen. Code, § 1260 [appellate court "may, if proper, remand the cause to the trial court for such further proceedings as may be just under the circumstances"].)

A.  *Whether L.C. Can Be Rehabilitated While in Juvenile Court Jurisdiction*

We begin with the juvenile court's decision that the second factor—the possibility that L.C. can be rehabilitated while in the jurisdiction of the juvenile court—favored transfer. The court found L.C. could "never be rehabilitated" in the remaining seven years of juvenile court jurisdiction without an understanding of "[w]hat is it with her family, with her relationship?" This decision was informed by the court's threshold view of dysfunctional "dynamics" in L.C.'s family; it believed there was something "off" with L.C. and her father's relationship or "distinctly wrong" there. In making these observations, however, the court candidly admitted its view was not based on any evidence: "[T]here was a lot of evidence that I wished I had that I didn't have." The court commented on L.C.'s parents' lack of emotion and L.C.'s "clueless[ness]" based on "jealousy or maybe based on

22

something she can't talk about is happening to her in her family," suggesting it might be "verbal abuse" or "pressuring her to be her best when no person's perfect." Such speculation is not evidence. (*People v. Waidla* (2000) 22 Cal.4th 690, 735.) Matters outside the evidence cannot be the basis for a juvenile court's transfer findings. (*Jones, supra*, 18 Cal.4th at pp. 681-682 [juvenile court's discretion must be exercised within the framework of the juvenile court law].)

In assessing L.C.'s potential for rehabilitation the court repeatedly expressed concern about L.C.'s *parent*'s behavior, characterizing them as both enabling and indifferent, and it appeared to believe L.C.'s parents would either be essential participants in L.C.'s rehabilitation to the exclusion of other efforts or otherwise in control of the "solution to keeping the community safe . . . ." While parents certainly are a component of a minor's successful rehabilitation, the rehabilitation provided by the juvenile justice system includes, among other treatment, programs in trauma recovery and life skills, individual and group counseling, and education. (See *People v. Superior Court* (*Alexander C.*), *supra*, 34 Cal.App.5th at p. 1000, citing Assem. Com. on Public Safety, Rep. on SB 1391 (2017-2018) Reg. Sess. as amended May 25, 2018, p. 4 ["Keeping youth in the juvenile justice system means they will be punished, but they will also be required to be in treatment, counseling, and rehabilitative programming and education"]; *C.S. v. Superior Court, supra*, 29 Cal.App.5th at p. 1020.) The record contains no indication that L.C. would be released to her parents; rather she would continue to be detained on home supervision with her uncle. Given the court's misapprehension of L.C.'s conditions for rehabilitation and the scope of the juvenile court's rehabilitative program, we cannot say its finding on this factor was an exercise of informed discretion. (See *J.N. v. Superior*

23

*Court, supra*, 23 Cal.App.5th at p. 715 ["a discretionary order based on incorrect legal assumptions is not an exercise of informed discretion and is subject to reversal"].)

B. *Criminal Sophistication*

The court's analysis of the criminal sophistication factor is likewise problematic. That factor is largely an inquiry into evidence of traits *of the minor* and his or her environment and upbringing. (§ 707, subd. (a)(3)(A)(ii) [relevant inquiries include age; maturity; intellectual capacity; physical, mental, and emotional health; impetuosity or failure to appreciate risks and consequences of criminal behavior; effect of familial, adult, or peer pressure on minor's actions; effect of the minor's family; community environment and childhood trauma].) Though the court touched on L.C.'s lack of juvenile criminal history and her high intelligence, its main focus was on the manner of L.C.'s commission of the charged crimes (the "planning" and "way it was done"), the truth or falsity of L.C.'s sleepwalking, and the purported family dysfunction or cover-up by L.C.'s parents.

As we have explained, the court's observations about the perceived dysfunction or problems in L.C.'s family were not based on evidence, but were suppositions. On this record we cannot draw nonspeculative inferences supporting the finding of family dysfunction. L.C. and her parents reported having a good relationship with each other, and denied any history of abuse, neglect or exposure to domestic violence. L.C. reported that she was close with her parents and got along with them and her brother. Though probation officer Pinedo noted that after the incident someone had made a child protective services referral complaining of L.C.'s parents' minimization of the offense, the case worker ultimately determined the referral was unfounded. The case worker reported there "appears to be no safety concerns as the

24

family are [*sic*] following the Court rules to ensure [D.C.'s] safety." The court engaged in similar speculation when positing that the parents cleaned L.C.'s body or had her shower, and removed bloody clothing: "I don't have any evidence about what happened to [L.C.'s] clothes if she was wearing them. I don't know if they were bloody." This too was used by the court to support its conclusion that there was "something wrong with [L.C.] and her upbringing, and I don't know what it is."

Further, the court's discussion of L.C.'s planning, even if such evidence tended to show criminal sophistication, was based in part on a misstatement of facts contained in the People's transfer brief and several reports recounting L.C.'s offenses. These materials attribute an action to L.C. that she did not say in her police interview, namely, that she "ran her finger along the edge of the knife because she wanted to make sure it was sharp enough to work" or otherwise tested the knife for sharpness before she stabbed her brother. L.C. in the interview denied testing the knife.[7] Setting aside the court's use of a fact not in evidence in its analysis, we question the court's undue reliance on

---

[7] "[Detective Volker]: What . . . thoughts were going through your mind when you reached in that drawer and picked up the knife. I knew [*sic*] you remember.
    "[L.C.] If, if it was sharp.
    "[Detective Volker:] K.
    "[L.C.] Yeah.
    "[Detective Volker:] *Did you test it to see if it was sharp*?
    "[L.C.] *No.*
    "[Detective Volker:] K. Why were you wondering if it was—
    "[L.C.] (UNINTELL)
    "[Detective Volker:] Uh. huh. Why are you wondering if it was sharp?
    "[L.C.] Just I think I just is if it would work [*sic*], I guess. I mean, I, yeah."
    L.C. went on to tell the detective that she did not want to stab D.C. but "wanted it to be quick. I wanted it to be just his throat." She said that was why she wanted to be sure the knife was sharp.

25

the circumstances of the present offense to assess L.C.'s criminal sophistication, as the gravity and circumstances of the offense is itself an independent factor to consider in the transfer inquiry. The court gave the "greatest weight" to its perception that L.C. had engaged in substantial planning, apparently believing it outweighed all of the experts' opinions, summarized above, that L.C. did not demonstrate evidence of criminal sophistication "to any degree."

Finally, with regard to the claim that L.C. was sleepwalking, we see little distinction between these circumstances and those in *Rodrigo O.* As summarized above, in that case this court faulted the juvenile court for relying on the minor's alibi defense in assessing criminal sophistication and his offense's seriousness. (*Rodrigo O.*, *supra*, 22 Cal.App.4th at pp. 1303-1304.) The People maintain that unlike in *Rodrigo O.*, the juvenile court in this case was not considering an affirmative defense, but instead saw the sleepwalking claim as a fact "tending to reduce L.C.'s blameworthiness" or showing the crime was "not as grave or serious as the charge would initially lead a court to conclude," weighing against L.C.'s criminal sophistication. But the sleepwalking claim goes directly to L.C.'s volition or consciousness, and "[u]nconsciousness, when not voluntarily induced, is a complete defense to a charged crime." (*People v. Rogers* (2006) 39 Cal.4th 826, 887; see *People v. Sedeno* (1974) 10 Cal.3d 703, 717 ["An unconscious act within the contemplation of the Penal Code is one committed by a person who because of somnambulism, a blow on the head, or similar cause is not conscious of acting and whose act therefore cannot be deemed volitional"], overruled on other grounds in *People v. Breverman* (1998) 19 Cal.4th 142.) When there are facts to support it, unconsciousness is an affirmative defense (see *People v. Boyer* (2006) 38 Cal.4th 412, 468-469), and sleepwalking would qualify, as

26

"unconsciousness need not rise to the level of coma or inability to walk or perform manual movements" but "can exist 'where the subject physically acts but is not, at the time, conscious of acting.' " (*People v. Halvorsen* (2007) 42 Cal.4th 379, 417.)

The record does not show the juvenile court utilized the sleepwalking evidence as mitigating evidence or a lessening of the gravity or seriousness of the offense.  It weighed its credibility, plainly disbelieving the evidence that L.C. was sleepwalking while she stabbed D.C. and instead finding "[s]he wasn't sleepwalking" and "knew exactly what she was doing," in part based on the unsupported fact that L.C. tested the knife for its sharpness.  The court's remarks were nothing more than a rejection of L.C.'s unconsciousness defense and the sort of assessment of guilt or innocence that has no tendency in reason to establish her amenability to treatment in the juvenile court system.  (*Rodrigo O.*, *supra*, 22 Cal.App.4th at pp. 1303-1304; *Jones*, *supra*, 18 Cal.4th at p. 682.)  Further, the court stated L.C.'s "attempt to deflect by claiming that she was sleepwalking" was one of the pieces of evidence to which it gave the "greatest weight" in reaching its decision.[8]  In doing so, the court abused its discretion.

C. *Previous Delinquent History and Prior Juvenile Court Attempts at Rehabilitation*

We discuss the juvenile court's analysis of the third and fourth criteria together, because by all accounts in the record L.C. had no prior criminal history and there were no prior juvenile court attempts to rehabilitate her.

---

[8]    The court did not discuss the sleepwalking evidence in connection with the factor of L.C.'s potential for rehabilitation as some indication of L.C.'s failure to take responsibility for her actions.  The court's remarks about L.C.'s "attempt to deflect" shows it viewed that evidence in the context of whether L.C. did or did not commit the offenses.

According to probation officer Pinedo, L.C. had no record of being suspended or expelled from school as a disciplinary measure. Despite this, as summarized above, the juvenile court seemingly went on to discuss the fourth criteria, remarking that while L.C. had not participated in "true rehabilitation in the sense of the word," L.C.'s parents had somehow "bent [over] backwards" to make the time between her offense and the transfer hearing overly easy or comfortable for her. The court criticized L.C.'s parents' decision to defer her admission to college as an indication they minimized the event and L.C.'s actions. It posited that L.C. would need "extensive psychotherapy," finding L.C. had no "real guilt" about what had happened; that her behavior seemed like "something a sociopath would do." The court went on to state it did not think L.C. would gain insight into what she had done and "figure out what made her do this" in eight years "since it took her 17 years to get to that point . . . ."

The court's remarks merge the factors of past juvenile court rehabilitation with considerations—L.C.'s potential for growth and maturity—going to the question of whether L.C. could be rehabilitated in the time remaining before expiration of juvenile court jurisdiction. The court also considered what it believed to be L.C.'s parents' minimization of the offense, or some failure on *their part* as to L.C.'s treatment pending the transfer hearing, seemingly as part of the fourth criterion. The fourth factor, however, deals with past *juvenile court* rehabilitative attempts for prior offenses, of which there were none. Even if the juvenile court was able to consider interim rehabilitative efforts in juvenile hall for L.C. or L.C.'s home detention in connection with the present offense, the record in this case reflects that effort was successful, and L.C. had no issues or disciplinary problems. Probation officer Pinedo reported that L.C. was compliant with all

28

of the conditions put on her during the time between L.C.'s detention and the transfer hearing.

The court did not state whether the prosecution had met its burden to show the fourth factor weighed in favor of transfer to criminal court, nor is it clear whether the court found these factors favored a finding of L.C.'s amenability to juvenile court treatment, favored transfer, or were neutral. Rather, it went on to discuss the gravity and seriousness of the offenses, which was one of the factors it primarily relied upon to support its decision to transfer L.C. to adult/criminal court.

D. *Gravity and Circumstances of the Offense*

The juvenile court found L.C.'s offenses were "horrific." That finding undoubtedly is supported by the evidence of the number and nature of the stab wounds L.C. inflicted on D.C., who was asleep in his bed and defenseless. The gravity and seriousness of an offense can by itself support a court's decision to transfer a minor to adult court. However, the juvenile court here again laced its analysis of this factor with a discussion of L.C.'s *parents*, appearing to criticize the father's belief that L.C. was sleepwalking.[9] And the court's conclusions about the nature of L.C.'s crime demonstrate it believed L.C. carefully planned the offense and acted out of jealousy or "hat[red]" toward D.C.; that L.C. selected and tested the sharpness of the knife she used, then sought to cover up her crime herself or in conjunction

_____

[9] The court stated: "I also want to say that it was very disconcerting— this kind of goes in with the previous one about rehabilitation and the gravity of offense. When a parent has said, 'Don't talk to your child about this,' and then he videotapes him and asks him about the event, and it's so wrong, and it makes me wonder what they're telling him, and what his attitude's going to be by the time this matter gets to court if it ever goes to court." The court's remarks referred to L.C.'s father's testimony that he had videotaped D.C. and asked D.C. what happened on the night in question.

29

with her parents by removing her bedclothes, and "deflect[ed]" from her actions by lying about sleepwalking at the time. For the reasons explained, these were improper considerations in assessing L.C.'s amenability to juvenile court treatment.

E. *Consideration of Expert Opinions*

Though before the transfer hearing the juvenile court stated it had read all of the written materials presented by counsel, its ruling in our view does not clearly indicate it considered the testimony of the experts and probation officer Pinedo that the factors, considered in total, demonstrated L.C. was a proper subject for juvenile court jurisdiction. The court must weigh the testimony and opinions of those witnesses with all of the other evidence, eliminating the improper considerations and speculative assumptions.

We do not pass on whether substantial evidence supports the court's proper findings, or express any view on L.C.'s fitness for juvenile court treatment. In our view, the court's undue consideration of speculative and improper matters tainted its analysis and rendered it an abuse of discretion, requiring that the parties be given an opportunity for a new transfer hearing avoiding these errors. We also conclude the court's remarks concerning L.C.'s parents and their behavior would cause parties to reasonably entertain a doubt about the court's impartiality. Because L.C. deserves a hearing in which the juvenile court undertakes a proper consideration of the section 707 factors, we issue the writ for L.C. to receive a new transfer hearing before a different judicial officer, and order the juvenile court to conduct that hearing in accordance with our foregoing conclusions.

## DISPOSITION

Let a peremptory writ of mandate issue directing the respondent superior court to vacate its order transferring the matter to adult/criminal court and assign the matter to a new juvenile court judge, who shall conduct a new transfer hearing and make findings sufficient to ensure its decision permits meaningful appellate review. This opinion is made final as to this court seven days from the date of filing. (Cal. Rules of Court, rule 8.490(b)(2)(A).)

O'ROURKE, J.

WE CONCUR:

McCONNELL, P. J.

AARON, J.

31